IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

**VÍCTOR ÁLVAREZ MAURÁS**,
    Plaintiff,

v.

**BANCO POPULAR DE PUERTO RICO, INC.** *et al.*,
    Defendants.

Civil No. 16–2864 (BJM)

## OPINION AND ORDER

Víctor Álvarez Maurás ("Álvarez") brought this action against Banco Popular de Puerto Rico, Inc. ("Banco Popular"), Alexander García ("García"), Wanda O. Meléndez Santos ("Meléndez"), and the conjugal relationship between García and Meléndez (collectively "defendants"), alleging a violation of the civil provisions of the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1962. Docket No. 1 ("Compl."). Defendants moved to dismiss the action under Federal Rules of Civil Procedure 12(b)(1), and 12(b)(6), and 12(b)(7), Docket No. 18, 31, 38, and Álvarez opposed. Docket No. 29, 33. The parties consented to proceed before a magistrate judge. Docket No. 23.

For the reasons set out below, the motion to dismiss is **GRANTED**.

## MOTION TO DISMISS STANDARD

Federal Rule of Civil Procedure 12(b)(1) governs motions to dismiss for lack of subject-matter jurisdiction. Fed. R. Civ. P. 12(b)(1). As courts of limited jurisdiction, federal courts are bound to construe jurisdictional grounds narrowly. *See, e.g.*, *Hawes v. Club Ecuestre El Comandante*, 598 F.2d 698, 701 (1st Cir. 1979). When deciding a motion to dismiss under Rule 12, a court must accept as true all well-pleaded factual claims, and indulge all reasonable inferences in the non-movant's favor. *McCloskey v. Mueller*, 446 F.3d 262, 266 (1st Cir. 2006); *Deniz v. Municipality of Guaynabo*, 285 F.3d 142, 144 (1st Cir. 2002). The party asserting federal jurisdiction has the burden of proving its existence by the preponderance of the evidence. *Murphy*

*v. United States*, 45 F.3d 520, 522 (1st Cir. 1995); *Bank One, Texas v. Montle*, 964 F.2d 48, 50 (1st Cir. 1992).

When deciding whether subject-matter jurisdiction exists, the court follows two general rubrics: (1) when a defendant challenges the legal sufficiency of the facts alleged, the court credits plaintiffs' factual allegations and draws reasonable inferences in his or her favor; and (2) when the defendant challenges the truth of facts alleged by the plaintiff and offers contrary evidence, the court weighs the evidence. *Valentín v. Hosp. Bella Vista*, 254 F.3d 358, 363 (1st Cir. 2001).

"Rule 12(b)(1) is a 'large umbrella, overspreading a variety of different types of challenges to subject-matter jurisdiction,' including the existence of a valid arbitration agreement covering the dispute." *Union de Periodistas v. San Juan Star Co.*, No. CIV. 07–1481 (ADC), 2008 WL 4072803, at *4 (D.P.R. Aug. 27, 2008) (citing *Valentin v. Hosp. Bella Vista,* 254 F.3d 358, 362–63 (1st Cir. 2001), *Evans v. Hudson Coal Co.,* 165 F.2d 970, 972–73 (3rd Cir. 1948)).

To survive a motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6), on the other hand, "an adequate complaint must provide fair notice to the defendants and state a facially plausible legal claim." *Ocasio-Hernández v. Fortuño-Burset*, 640 F.3d 1, 12 (1st Cir. 2011). The plaintiff must set forth "factual allegations, either direct or inferential, regarding each material element necessary" for the action. *Gooley v. Mobil Oil Corp*., 851 F.2d 513, 514 (1st Cir. 1988). In evaluating a motion to dismiss, the court first discards any "'legal conclusions couched as fact' or 'threadbare recitals of the elements of a cause of action.'" *Ocasio-Hernández*, 640 F.3d at 12 (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555 (2007)). The remaining "[n]on-conclusory factual allegations" are fully credited, "even if seemingly incredible." *Id*. The court engages in no fact-finding and does not "forecast a plaintiff's likelihood of success on the merits." *Id.* at 13. Rather, it presumes that the facts are as properly alleged by the plaintiff and draws all reasonable inferences in the plaintiff's favor. *Schatz v. Republican State Leadership Comm.*, 669 F.3d 50, 55 (1st Cir. 2012). Taken together, the facts pleaded must "state a plausible, not a merely conceivable, case for relief." *Ocasio-Hernández*, 640 F.3d at 12.

On a 12(b)(6) motion to dismiss, a court may not ordinarily consider any documents that are outside of the complaint or expressly incorporated therein unless the motion is converted into one for summary judgment. *Watterson v. Page*, 987 F.2d 1, 3 (1st Cir. 1993); *Rivera-Torres v. Castillo*, 109 F. Supp. 3d 477, 482 (D.P.R. 2015). "However, courts have made narrow exceptions for documents the authenticity of which are not disputed by the parties; for official public records; for documents central to plaintiffs' claim; or for documents sufficiently referred to in the complaint." *Watterson*, 987 F.2d at 3–4. "And a court ordinarily may treat documents from prior state court adjudications as public records." *Boateng v. InterAmerican Univ., Inc.*, 210 F.3d 56, 60 (1st Cir. 2000).

## BACKGROUND

The following facts are taken from the Complaint, unless otherwise noted, and are assumed to be true for the purposes of this motion. In 1998, Álvarez had a certificate of deposit with Banco Popular for $1,159,000. Compl. at 8. A first-time investor, he chose to invest his savings in securities so that he would have a monthly income stream as well as money for when he retired in 2009. Compl. at 7–8. On December 17, 1998, Álvarez deposited $875,000 into an investment account with Popular Securities, Inc. ("Popular") through his broker, García. Compl. at 7. Álvarez then deposited another $125,000 three months later on February 11, bringing his account to a total of $1,000,000. Compl. at 7–8. As part of the paperwork Álvarez completed to invest with Popular, he signed an arbitration agreement binding him to arbitrate any claims he had against Popular. Docket No. 18–4 at 5. In relevant part, the arbitration agreement states, "All controversies that may arise between the undersigned and you, as introducing or clearing broker, your agents, or employees, concerning any transaction or the construction, performance, or breach of this or any other agreement between us . . . shall be determined by arbitration." *Id*.

Between April 20, 1999 and January 19, 2000, García allegedly forged Álvarez's name on four withdrawals and fraudulently transferred $419,632 from Álvarez's account. Docket No. 29 at 1. When Álvarez noticed that his account values had decreased, García assured him that the decrease was due to market fluctuations and that Álvarez would still have his full initial investment

of $1,000,000 available to him in 2009. Compl. at 9. Álvarez continued receiving the monthly interest, but he only received the monthly interest on a $600,000 investment as opposed to a $1,000,000 investment. Compl. at 9.

In 2009, though, when Álvarez sought to withdraw his $1,000,000, García told Álvarez that his initial investment had only ever been $600,000. Compl. at 9. Álvarez requested an investigation into the matter, which Popular conducted on January 28, 2009. Compl. at 9–10. After Popular concluded that Álvarez's initial investment was only $600,000, Álvarez requested a second investigation. Compl. at 10. Popular took two years to for its second investigation, but, in February 2011, eventually came to the same conclusion: Álvarez's initial investments were only ever $600,000. Compl. at 10. Álvarez notified Richard Carrión, CEO and Board Chairman of Banco Popular, of "the embezzlement activities," but received no response. Compl. at 10.

A year after Popular's investigations ended, Álvarez filed a statement of claim with the Financial Industry Regulatory Authority ("FINRA") against Popular. Compl. at 10–11. Although the statement of claim focused on the mismanagement of Álvarez's investment portfolio, it also stated, "As a result of Mr. Álvarez request, [Popular Securities, Inc.] initiated an internal investigation that erroneously concluded that the initial amount was $600,000, rather than $1,075,000, as of today there are $475,000 that still unaccounted for." Docket No. 18–1 at 4–5 After FINRA found that Álvarez "failed to present a prima facie case," FINRA dismissed his claims. Docket No. 18–2 at 2. Álvarez appealed FINRA's decision to the courts of Puerto Rico, but each court affirmed FINRA's decision. Compl. at 11–12. On October 20, 2016, Álvarez filed his claims with this court.

## DISCUSSION

A court must have subject-matter jurisdiction over each claim and can "proceed no further if such jurisdiction is wanting." *Godin v. Schencks*, 629 F.3d 79, 83 (1st Cir. 2010) (quoting *In re Recticel Foam Corp.,* 859 F.2d 1000, 1002 (1st Cir. 1988)); *Grail Semiconductor, Inc. v. Stern*, No. 13–03687, 2014 WL 12594162, at *3 (C.D. Cal. Mar. 3, 2014) (dismissing one of the defendant's causes of action in the counterclaim because it did not stem from the same case and controversy

as the complaint but finding that there was subject-matter jurisdiction over the remaining causes of action in the counterclaim because they were compulsory). Although motions to dismiss based on a preexisting arbitration agreement are brought as challenges to the court's subject-matter jurisdiction under 12(b)(1), "[a]n agreement to arbitrate does not divest a court of its jurisdiction." *Skirchak v. Dynamics Research Corp.*, 508 F.3d 49, 56 (1st Cir. 2007); *see DiMercurio v. Sphere Drake Ins., PLC*, 202 F.3d 71, 76 (1st Cir. 2000) ("Agreements to arbitrate are now typically viewed as contractual arrangements for resolving disputes rather than as an appropriation of a court's jurisdiction."). However, it is still appropriate to first address whether the parties are contractually bound to arbitrate these claims as that would require the court to decline to exercise jurisdiction. *See DiMercurio*, 202 F.3d at 76 (citing *Cranston Teachers Ass'n v. Cranston School Comm.*, 120 R.I. 105, 386 A.2d 176, 178 (R.I. 1978) for the proposition that an "arbitration agreement does not implicate [a] court's 'power to adjudicate the dispute' but 'raises the distinct question whether the court should have exercised that power'").

Section 2 of the Federal Arbitration Act ("FAA") provides that written agreements to arbitrate "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2 (1947). There is a strong federal policy favoring arbitration, and any doubts concerning the scope of the arbitrable issues should be resolved in favor of arbitration. *Kristian v. Comcast Corp.*, 446 F.3d 25, 35 (1st Cir. 2006) (citing *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24–25 (1983)). "By its terms, the [FAA] leaves no place for the exercise of discretion by a district court, but instead mandates that district courts shall direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed." *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 218 (1985) (emphasis in original). Accordingly, "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract language itself or an allegation of waiver, delay, or a like defense to arbitrability." *Mitsubishi Motors Corp. v. Soler Chrystler-Plymouth, Inc.*, 473 U.S. 614, 626 (1985).

"A party who attempts to compel arbitration must show that a valid agreement to arbitrate exists, that the movant is entitled to invoke the arbitration clause, that the other party is bound by that clause, and that the claim asserted comes within the clause's scope." *InterGen N.V. v. Grina*, 344 F.3d 134, 142 (1st Cir. 2003). The party seeking to compel arbitration has the burden to show the existence of an arbitration agreement. *See Diskin v. J.P. Stevens & Co., Inc.*, 836 F.2d 47, 51 (1st Cir. 1987). Once the movant makes this showing, "the party resisting arbitration bears the burden of proving that the claims at issue are unsuitable for arbitration." *Green Tree Financial Corp.-Alabama v. Randolf*, 531 U.S. 79, 91 (2000).

Nevertheless, the Supreme Court has noted that "arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *AT&T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 648 (1986) (citing *Steelworkers v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 582 (1960)). While the scope of the arbitrable issues should be resolved in favor of arbitration, the First Circuit has made clear that the defendants "must show . . . that the protagonists have agreed to arbitrate." *See McCarthy v. Azure*, 22 F.3d 351, 355 (1st Cir. 1994) ("The federal policy [favoring arbitration], however, does not extend to situations in which the identity of the parties who have agreed to arbitrate is unclear. Thus, requiring that arbitration rest on a consensual foundation is wholly consistent with federal policy." (citing *Painewebber, Inc. v. Hartmann,* 921 F.2d 507, 511 (3d Cir. 1990) (holding that "[a]s a matter of contract, no party can be forced to arbitrate unless that party has entered into an agreement to do so"))).

"In ruling on a motion to dismiss for lack of subject matter jurisdiction under Fed. R. Civ. P. 12(b)(1), the district court . . . may consider whatever evidence has been submitted, such as the depositions and exhibits submitted in this case." *Aversa v. United States*, 99 F.3d 1200, 1209–10 (1st Cir. 1996). Here, defendants presented the Customer Agreement, which is written on a Popular form and signed by Álvarez. Docket No. 18–6. Although this exhibit may be considered in ruling on the lack of subject matter jurisdiction, it is largely unreadable as it appears to have been photocopied multiple times and then poorly scanned. As the court cannot read the body of the

Customer Agreement on the second page of the exhibit, the court cannot consider those sections. *See* D.P.R. Civ. R. 7(e) (exhibits must be "verified for readability by filing counsel"); *Marrero-Rosado ex rel. JLSM v. Cartagena*, No. CIV. 05–2063 (SEC/JAF), 2009 WL 890473, at *4 (D.P.R. Mar. 27, 2009) (finding that the majority of the medical records submitted were illegible and, therefore, offered limited support for defendants' motion); *In re 1994 Exxon Chem. Plant Fire*, No. 94–MD–3–BMGL–SCR, 2006 WL 6203129, at *1 (M.D. La. Sept. 13, 2006) (refusing to consider illegible pages of the exhibit). However, the defendants also included in their motion the judgment of the Court of First Instance of the Commonwealth of Puerto Rico that quoted the section of the Customer Agreement addressing arbitration. Docket No. 18–4 at 5. Therefore, the court will use that excerpt of the Customer Agreement to determine the scope of the arbitration agreement. *Id*. In his response, Álvarez contested the applicability of the arbitration agreement, but he did not contest the validity of either the Customer Agreement or the state court decision quoting the Customer Agreement. *See* Docket No. 29 at 23–25.

The Customer Agreement appears on the back of the New Accoun . . . plication" (presumably, New Account Application) signed by "Victor Alvarez." Docket No. 18–6 at 1. At the top of the Customer Agreement, it states "To: Popular Securities, Inc (PS) In consideration of your opening one or more accounts on my behalf, I represent and agree as follows: . . ." *Id*. at 2. Paragraph 19 of the Customer Agreement states, in relevant part, "All controversies that may arise between the undersigned and you, as introducing or clearing broker, your agents, or employees, concerning any transaction or the construction, performance, or breach of this or any other agreement between us . . . shall be determined by arbitration." Docket No. 18–4 at 5. Interpreting the plain terms of the contract, "the undersigned" refers to Álvarez and "you" refers to Popular. Therefore, the arbitration agreement is binding on all controversies arising between Álvarez, Popular, the agents of Popular, and the employees of Popular.

The first question is which, if any, of the parties currently before the court are bound by the arbitration agreement. As the two parties directly named in the Customer Agreement, it clearly applies to disputes between Popular and Álvarez. Docket No. 18–4 at 5 ("All controversies that

may arise between the undersigned and you . . . shall be determined by arbitration."). Furthermore, as García is undisputedly an employee of Popular, it also applies to disputes between Álvarez and García. *Id*. ("All controversies that may arise between the undersigned and . . . your agents, or employees. . . shall be determined by arbitration."); Compl. at 3 ("Defendant Alexander García, is a resident of Puerto Rico and at all relevant times hereto, works as a Securities Broker with Popular Securities, Inc."). It is also possible that the arbitration agreement applies to disputes between Álvarez and Banco Popular as Banco Popular may be considered the agent of Popular. However, because Banco Popular did not make any arguments suggesting that it is an agent of Popular, it did not meet its burden of showing that it is one of the parties covered by the arbitration agreement. *See* Docket No. 18 at 16–20 (failing to even name Banco Popular in the section of defendants' motion to dismiss addressing lack of subject-matter jurisdiction).

As García passed the first hurdle, the second step is to determine whether the arbitration agreement covers the issues raised by Álvarez against García. Distilled down, Álvarez's claim is that García fraudulently transferred $419,632 from Álvarez's Popular investment account and that other parties then covered up the theft. The investment account in question is governed by the Customer Agreement, which states that all "transaction[s]" between García and Álvarez "shall be determined by arbitration." Docket No. 18–4 at 5. Resolving "any doubts concerning the scope of the arbitrable issues . . . in favor of arbitration," it is clear that the word "transaction" is broad enough to include the fraudulent transfers of money that are at the heart of Álvarez's claim. *Kristian*, 446 F.3d at 35; *see Jesus-Santos v. Morgan Stanley Dean Witter, Inc.*, No. CIV. 05-1336 (DRD), 2006 WL 752997, at *6 (D.P.R. Mar. 22, 2006) ("[T]here is a presumption of arbitrability in the sense that '[a]n order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute.'" (quoting *AT&T Technologies, Inc.*, 475 U.S. at 650)). Álvarez argues that the arbitration agreement does not apply to his current claims of fraud because those claims "were not litigated in the arbitration proceeding." Docket No. 29 at 24. But, whether Álvarez raised allegations of fraud in the prior arbitration and whether the arbitrator addressed those allegations

does not affect the fact that there continues to be a binding arbitration agreement between García and Álvarez that precludes Álvarez from bringing his current claims against García in federal court.

Consequently, the motion to dismiss must be granted for García, Meléndez, and the conjugal relationship between García and Meléndez as any grievances arising from the fraudulent transfer from Álvarez's investment account must be arbitrated.[1] The court cannot, at this stage, determine if the claims against Banco Popular must also be dismissed due to the arbitration agreement because defendants did not meet their burden of proof to show that Banco Popular is a covered party. Because the as-of-yet unproven existence of an arbitration agreement between Banco Popular and Álvarez does not destroy the court's subject-matter jurisdiction, the court moves on to address defendants' 12(b)(6) arguments as they pertain to Banco Popular, the remaining defendant.

Civil RICO claims are subject to a four-year statute of limitations. *See Lares Grp., II v. Tobin*, 47 F. Supp. 2d 223, 229–30 (D.R.I. 1999), *aff'd*, 221 F.3d 41 (1st Cir. 2000). To determine when the four years begins to accrue, the First Circuit applies the injury discovery rule, which has been endorsed by the majority of other circuits. *Lares Grp., II v. Tobin*, 221 F.3d 41, 44 (1st Cir. 2000). Under the injury discovery rule, the statute of limitations begins to accrue at "the time a plaintiff knew or should have known of his injury." *Id*. (quoting *Rodriguez v. Banco Central*, 917 F.2d 664, 665 (1st Cir. 1990)). For RICO claims, in particular, the Supreme Court held in *Rotella v. Wood,* 528 U.S. 549 (2000) "that a plaintiff need not know all the elements required to bring a legal claim under civil RICO to start the limitations period running. Thus, a RICO victim need not

---

[1] Alvarez never mentions Meléndez or the conjugal relationship between García and Meléndez in his complaint, other than to state that they are parties. The court must assume that his complaint against those parties are due to their relationship with García, and therefore they must be dismissed as well. *See Morales Figueroa v. Valdes*, No. CV 15-1365 (DRD), 2016 WL 1171512, at *6 (D.P.R. Mar. 24, 2016) (explaining that a spouse and a conjugal relationship may be held liable for the torts performed by the other spouse under Puerto Rico law); *Soto-Fonalledas v. Ritz Carlton San Juan Hotel Spa & Casino*, No. CIV. 09-2005 (JAF), 2010 WL 1328944, at *4 (D.P.R. Mar. 26, 2010), *aff'd Soto-Fonalledas v. Ritz-Carlton San Juan Hotel Spa & Casino*, 640 F.3d 471 (1st Cir. 2011) (dismissing the claims of the plaintiff, the plaintiff's husband, and the conjugal relationship between the plaintiff and her husband and compelling arbitration for all parties because the plaintiff signed an arbitration agreement).

have actual knowledge of exactly who committed the RICO predicate act resulting in the injury for a civil RICO claim to accrue." *Robert L. Kroenlein Tr. ex rel. Alden v. Kirchhefer*, 764 F.3d 1268, 1278 (10th Cir. 2014). "It is the injury and not the fact that it is specifically a 'RICO' injury that is relevant." *Hodas v. Sherburne, Powers & Needham, P.C.*, 938 F. Supp. 60, 63 (D. Mass. 1996), *aff'd*, 114 F.3d 1169 (1st Cir. 1997) (explaining that the plaintiff did not need to "know anything about the fees and commissions being charged or the alleged duplicity of . . . [the] defendants" for the statute of limitations to accrue because the question is whether the plaintiff knew of the injury itself, not "the 'conduct' that caused his injury").

Now, while Álvarez advocates that the phrasing in *Rotella* requires that the plaintiff also know "who has inflicted the injury," courts have already explained that this argument is a misinterpretation of the Supreme Court's holding. *See* 528 U.S. at 555–56. Responding to the plaintiff's claim that *Rotella* "impliedly required that a plaintiff at least know 'who has inflicted the injury,'" the Tenth Circuit explained, "*Rotella* merely cited *Kubrick* [an FTCA case] for the proposition that a plaintiff need not know all the elements of his claim for a claim to accrue. Knowledge of the perpetrator's identity was not at issue in either *Rotella* or *Kubrick.* What was at issue in *Kubrick* was whether a victim who knew both the injury and the *cause* of the injury . . . had the facts necessary" to trigger the statute of limitations in a malpractice claim. *Kirchhefer*, 764 F.3d at 1278 n.7 (internal citations omitted).

If, however, the defendants fraudulently concealed material facts "so crucial that without them plaintiff has no reasonable basis to even initiate legal action" then the statute of limitations is equitably tolled until the plaintiff knows or should know of his injury. *Hodas*, 938 F. Supp. at 64 (quoting *Cogburn v. United States*, 717 F. Supp. 958, 962 (D. Mass. 1989)). "To invoke the doctrine of fraudulent concealment, a plaintiff must plead and prove three elements: '(1) wrongful concealment of their actions by the defendants; (2) failure of the plaintiff to discover the operative facts that are the basis of his cause of action within the limitations period; and (3) plaintiff's due diligence until discovery of the facts.'" *In re Lupron Mktg. & Sales Practices Litig.*, 295 F. Supp.

2d 148, 183 (D. Mass. 2003) (quoting *Berkson v. Del Monte Corp.,* 743 F.2d 53, 55 (1st Cir. 1984)). The plaintiff carries the burden of proof. *Id*.

Noting that "the purpose of the discovery rule is to afford a suitable degree of protection to plaintiffs who have exercised reasonable diligence consistent with the information available to them," the First Circuit found that the statute of limitations for violations of securities law began not when "storm warnings" of the injury first appeared but only once "an investor, alerted by storm warnings and thereafter exercising reasonable diligence would have discovered the fraud." *Young v. Lepone*, 305 F.3d 1, 9 (1st Cir. 2002). Although the First Circuit applied this rule to violation of securities law, which only has a one-year statute of limitations as opposed to the more generous four-year statute of limitations afforded to RICO violations, it makes sense to consider this more generous rule in a case like this where the RICO injury alleged is in fact fraudulent transfers of securities.

Although whether the plaintiff knew or should have known of his injury is generally a question of fact that cannot be determined in a motion to dismiss, it is appropriate to dismiss on limitations grounds "when the underlying facts are either admitted or undisputed." *Lupron*, 295 F. Supp. 2d at 183–84 (D. Mass. 2003) (citing *Young v. Lepone,* 305 F.3d 1, 8–9 (1st Cir. 2002)); *see Marrero-Rolon v. Autoridad de Energia Electrica de P.R.*, No. CIV. 15–1167 JAG/SCC, 2015 WL 5719801, at *7–8 (D.P.R. Sept. 29, 2015) ("The bottom line is that the defendants' arguments rely on assumptions about what Plaintiffs knew or should have known and when they knew or should have known it. On the record before the Court, these questions cannot be resolved as a matter of law in the defendants' favor.").

In this case, according to the complaint, Álvarez deposited a total of $1,000,000 into his Popular investment account—$875,000 on December 17, 1998, and $125,000 three months later on February 11. Compl. at 7–8. Then, between April 20, 1999 and January 19, 2000, García fraudulently transferred $419,632 from Álvarez's account through forging Álvarez's name on four withdrawals. Docket No. 29 at 1. Álvarez noticed that his account values had decreased, and García assured him that the decrease was due to market fluctuations and that Álvarez would have his full

initial investment of $1,000,000 available to him in 2009 as they had agreed. Compl. at 9. Despite these assurances, when Álvarez sought to withdraw his $1,000,000 in 2009, García told Álvarez that his initial investment had only ever been $600,000. Compl. at 9. Álvarez requested an investigation into the matter, which Popular conducted on January 28, 2009. Compl. at 9–10. After Popular concluded that Álvarez's initial investment was only ever $600,000, Álvarez requested a second investigation. Compl. at 10. Popular took two years to for its second investigation, but, in February 2011, eventually came to the same conclusion: Álvarez's initial investments were only ever $600,000. Compl. at 10. Álvarez notified Richard Carrión, CEO and Board Chairman of Banco Popular, of "the embezzlement activities," but received no response. Compl. at 10.

In summary, before filing a Statement of Claim with FINRA on January 12, 2012, Álvarez knew that: his account contained $400,000 less than it should have, Popular had conducted two investigations into the matter but continued to fraudulently claim that his $400,000 never existed, and the CEO and Board Chairman of Banco Popular was choosing to do nothing when informed of the loss. Almost nine years after first realizing that his account balance was far lower than it should be, over five and a half years from the end of Popular's second investigation concluding that Álvarez had only ever invested $600,000, and more than four and a half years since filing a statement of claim with FINRA, Álvarez filed this complaint alleging RICO violations on October 20, 2016. These facts are all admitted by Álvarez as they appear in his complaint.

Although Álvarez had "storm warnings" of the defendants' fraud before 2009, such as when he noticed that his account value was decreasing, García's fraudulent reassurances that such a decrease was normal could have prevented Álvarez from realizing that his money had been stolen. Similarly, this reassurance could have also prevented Álvarez from becoming concerned when he started to receive monthly interest on a $600,000 investment as opposed to a $1,000,000 investment. To toll the statute of limitations based on fraudulent concealment, Álvarez must prove wrongful concealment of the defendants, his own failure to discover the operate facts, and his due diligence until discovery of those facts. Here, Álvarez has successfully pled that García wrongfully concealed his theft through his reassurances that the drop in Álvarez's investment was due to

normal market fluctuations. Álvarez also pled that he believed García, his broker, and therefore did not discover the theft. Although there is little in the complaint to prove Álvarez's due diligence until García falsely told him in 2009 that his $400,000 had never existed, the court will assume for now that Álvarez can prove that element of fraudulent concealment as well.

Consequently, with the statute of limitations tolled due to fraudulent concealment, Álvarez first knew of his injury in 2009 when he found out that his account balance was $400,000 less than what he had invested. Even at this point, Álvarez could argue that he was still under the effect of García's fraudulent concealment and that he believed that the loss was just a misunderstanding. However, after the completion of Popular's two unsatisfactory investigations, Álvarez knew or should have known of his injury—the loss of $400,000. He knew or should have known that García had lied to him about his account balance bouncing back. Given the results of the over two years of investigations, he knew, or should have known, that even if Popular had not caused the loss, they were concealing it. And, given the lack of response to his letter to Banco Popular's CEO and Board Chairman, he also knew or should have known that Banco Popular was not prepared to remedy his injury. Furthermore, it is indisputable that four years and nine months before filing this complaint, Álvarez did in fact know that he was injured as he stated as much in his 2012 Statement of Claim to FINRA. *See* Docket No. 18–1 at 4–5 ("As a result of Mr. Álvarez request, [Popular Securities, Inc.] initiated an internal investigation that erroneously concluded that the initial amount was $600,000, rather than $1,075,000, as of today there are $475,000 that still unaccounted for."). Although dismissing a case based on the statute of limitations is usually premature at this stage, here the facts are unassailable: Álvarez knew of his injury and its cause at the very least four years and nine months before filing this RICO action. As the statute of limitations for RICO claims is four years, Álvarez's claim against Banco Popular must be dismissed as time-barred.

## CONCLUSION

For the foregoing reasons, defendants' motion to dismiss is **GRANTED**. The claims against García, Meléndez, and the conjugal relationship between García and Meléndez are

dismissed without prejudice to pursue them in arbitration; the claims against Banco Popular are dismissed with prejudice. **IT IS SO ORDERED.**

In San Juan, Puerto Rico, this 7th day of November, 2017.

*S/ Bruce J. McGiverin*
BRUCE J. MCGIVERIN
United States Magistrate Judge